Employee Relationships. This one is no different. The cab companies are very adept at morphing based upon the decisions that have come down in the previous to the changes. In this case my client was assaulted and struck over the head and robbed while driving his cab. His injuries resulted in a brain injury, resulted in a craniotomy for which you and I are paying for as taxpayers, which is a different issue altogether but could have been easily resolved. The threshold issues are, in this case, as they usually always are, the employee is governed by the right to control and the nature of the business performed. Let's talk about the right to control for a second. And I think that the facts are sort of tragic and compelling, but my first question is, did the taxi cab company have the right to control the claimant's work schedule or his use of the vehicle? No, he did not, Your Honor. Did they control the manner in which he performed his work? In a way, yes. They had rules and regulations as to, that governed the cab, that governed his courteousness to the people, that governed the cleanliness of the cab, that governed his dress, that there were suspensions if he didn't comply with that, that there were fines if he didn't comply with that. But he could still drive a cab during those suspensions, could he not? Could he drive that cab? He could drive the cab, Your Honor, except at the testimony of their own witness. This is suburban cabs, by the way. They're not being hailed on a corner like downtown Moot Pier. But the witness, their own witness, Yatzik, testified that 99 percent of their business came through the computer. We understand that. Okay. My question was, he could drive the cab. Yes, technically he could. Okay. And who owned the vehicle? Who owned the cab? He owned the vehicle. He was mandated to get that vehicle painted. He was mandated to get that vehicle painted a particular color. He was mandated to have the vehicle tagged with the 303 signature. The Kuttermans and he, yeah, the way the vehicle looked, things like that. But they didn't control his schedule. They didn't control his use of the vehicle. He didn't report his earnings to them. And if they dispatched a call to him, he was strictly, he could decide on his own if he took the call or not, right? That's right. But he also had to be an on-off meter. He had to be within a zone. The on-off meter was for that purpose, to keep him within a zone so that the company knew where he was at. And as you know, the case law clearly states in the past that whether he was paid, whether withholdings were paid, whether he had a label or contractual label, those are relatively minor in comparison to the right to terminate, in my opinion. The right to terminate seems to be of utmost importance, which in this case, they had at least a constructive right to terminate. I think the right to control is probably the most important factor. And the right to control, I believe, is derived from their ability to use the threat of termination to cut off the computer. They had a three-strike rule that if you hit that three-strike rule, you were permanently cut off the computer. That was tantamount to just firing. They had to return the computer, in fact. Let me ask you the tough point in question. As cases say, I mean, there's probably arguable factors that would indicate extensively an employer-employee relationship. There's those that would indicate an independent contractor relationship. So if the factors are sort of evenly balanced, on what basis do we find that the commission's decision is against the manifest weight of the evidence? I assume that you're indicating that they're evenly balanced. If the factors are such as that the more important factors are the ones that you're looking at, and in this case we haven't even touched on the nature of the business, then I would say that you should overrule and reverse. And in this case, which I will get to, the nature of the business, I think it's almost clear. They advertised themselves as a taxi company. They processed themselves as a taxi company. They went to the villages to get licenses as a taxi company. They even indicated, if you read their owners' statements in this testimony, his whole purpose was to get more cabs on the street, to eliminate competition. And yet, at the same time he's talking about eliminating competition, they're saying in another testimony that, oh, we didn't care if he drove somewhere else while he was suspended. We wouldn't know. When I asked him that question, he never answered. He just said, we wouldn't know. But the fact of the matter is, logically speaking, what other company? What other company would pick up a driver who's bearing the 303 flagship on his car with 303's phone number? What other taxi company would do that? I don't know of any, Ken. I suppose there are, but I don't know of any. So are you saying that the desire to increase their business and drive out competition somehow means that the employee becomes an employee? No, I'm not saying that. But I'm saying that for them to say that the nature of their business was anything other than a taxi company, that they were so intermingled, that they were so entwined with the computer leases to get more cars on the street, to get more computer leases at $500 a month, to get a membership at $300 a month, that's $800 right off the bat. Did they think that their cab driver was going to park his car in a garage? And if he did, did he think they were going to please the village, the residents of that village, by doing so? The whole purpose was to please the village and get more cars on the road. So let's look at some of the items of control here before we get to the others. They had a cab that they forced the colors on. They had a cab that they took. We now have computers instead of radios, so I'm going to interchange that with the previous cases. They accepted computer communication all the time. The vast majority of it was computer communication. They had to pay in between the two. And I kind of looked over this, I'll tell you the truth, until I was looking over the record for this argument. The membership was another $300 a month, the Twishkowers said. That's $800 total right then and there. It was a 30-day lease at the minimum. He had great input into his car by having it painted. If he disengaged, he'd have to have the paint removed. And on top of it, they had to stick the computer in the front seat of his car. They had to have it installed. Then we get to whether there was insurance, which is where we should... Was part of the contract that he'd have to have the paint removed if he disengaged, as you said? Pardon me? Was part of the contract that he'd have to have the paint removed from his car if he disengaged? The testimony was that they'd have to return the computer to the company. Okay. So that's it. But he could drive around forever with that on his car. But the only indication was that by the general manager was that they would have to go to court, which they did in one instance, to get the computer back. We're talking only the computer. We're talking, I'm talking about the paint on the car, which is what you were talking about. Yes. If he didn't remove the paint, yeah, the paint would stay on the car. Okay. So he didn't have to take the paint off. You said he would. He didn't have to, but if he decided that he would have to take the paint off. If he decided to drive for another company, he would have to take the paint off, I'm sure, and remove all that paint, and getting it repainted would be a costly item. Especially when we get back to comparing that with the Westcad case. Because the Westcad case, they walked in, as long as I had a chauffeur's license, I could walk in in Westcad, and I agree with Westcad. By the way, I agree with counsel who represented Westcad. I agree with them. They were an independent contractor. Because the lease said, we don't care where you go, how you go, we don't even want to know, well, you don't even want to know what you're doing with that cab. And in fact, you don't have to pick up a passenger. If I've got a chauffeur's license, my car's in the shop, I want to go play a round of golf up at Geneva National, I could go in there and pay $1.85 an hour, 22 cents a mile, do my round trip, play my round of golf, come back, give them $44, and that's it. And that's about a third or fourth of the price of what I have to pay Avis or Hertz. It's a good deal. They are what they want to be. They could be a cab company, they could be a car company, a leasing company, they could be a packaging delivery company. But in any event, there were no strings. You rent a car from them, the car was already painted, it was not your car, you had no output in it, you had no money put out on it. They provided the insurance, unlike here where we had, quote, unquote, recommended vendors, a list of recommended vendors, which so happened to be one of the companies which the general manager sold insurance for before he became the general manager. Which, by the way, he testified that it was the village. He testified that there was no village requirement that they be painted the same color, yet the owner of the company came in and strictly contradicted him and said it was a village requirement for uniformity. Yet the arbitrator said, well, this is more credibility on their part. I don't see any part of my client's testimony which was incredulous, yet when I compare the testimony of their clients, especially when I call their client as an adverse witness, compare his testimony compared to when he was called on direct,  So we have here, besides the computer shutdown for three violations, we have here a pamphlet that my client was given, in which the pamphlet said, there's a $50 charge for training classes. There's a meter on and off fine of $50. There's a $50 fine for violations that result in warnings. Signed, the management. But when it came to testimony, this was done on behalf of the drivers. They didn't say the management on behalf of the drivers, they said the management. We go to the attention of the drivers. Any driver caught will be fined $50 for each offense, no exceptions. The management. Destination procedures, short blocking, that is illegal. You will be fined $100. The management. Oh, excuse me, this one was signed by Andre, who was the general manager. There's nothing in here that says that this was on behalf of the cab company or the drivers. They had zones. They had preferred customer rates for Kraft and United Airlines employees, which my cab driver had to give. He didn't have any choice in the matter. They had credit card instructions, 20-step credit card instructions. If he was not able to comply with that, it was his problem. If he got lost going to a call, it was his problem. He had to kick up half of the fine. Half of the fare is a fine. Even if he got lost picking him up, trying to find a place where he was supposed to go, he didn't even speak English, for crying out loud, much less know the destination. Let's see what Mr. Gower said in his testimony. He's the owner. Mr. Gower said, in terms of a business operation, stated, and I quote from page C419 of the transcript, for example, villages give you their permission. It is a collective effort for everyone to provide good service within the village. If you get complaints from the village, it is not up to par. The village then looks to either eliminating or reducing the number of certificates by certain companies based upon compliance or allowing other companies to come into your territory and dilute the opportunities. There is an incentive on both sides. Both sides. It's a symbiotic relationship. They all did the same thing. It was a taxicab run and operated by a taxicab company, acted like a taxicab company. My client was a driver for a taxicab company. Simply getting people from point A to point B. And it certainly doesn't sound like Mr. Gower was very sympathetic when it came to competition and allowing you to drive anywhere else. If that was his mindset right there. Let's go on to Mr. Gower. He was out to promote the brand. The bigger the customer base, the more subscription equipment leases, you can sell to more vehicles. If they want to satisfy the village, they certainly weren't going to get that done. They had to satisfy the village to increase their base, to increase their subscriptions and their certificates. And that was nothing more than a well-sheeled disguise of fair sharing. And that's how they've morphed from in the past. This case is on all squares basically with Yellow Cab 2. They received communication. They had to have their car painted. They could have been fired or terminated constructively at least in my opinion. They had the logos on it. And these cars were driving all over the suburbs. They're getting a lot of advertisement, a lot of goodwill just by their being on the street. If you go to the West Cab case, the lease stated, you were never required to report whereabouts. They had no right or will they attempt to exercise any supervision. Not restricted in any manner. Not restricted. They had no discipline. If you've got a customer complaint, there's nothing in the West Cab that I read where they could be disciplined or suspended. Oh, sure, they had the right to refuse a driver a car the next day, but it was a daily lease. In West Cab, did the commission find in favor of the claimant? The West Cab found in favor of the company. And I think that was a reversal from the lower court, if I'm not mistaken, Your Honor. In the West Cab case, if a driver got suspended, he had nothing involved as I told you. He could go out and go to another walk in the door of another company, another cab company, the next day and he's back in business. That's not the way it was with my guy. There was involvement with my guy. So if you were to prioritize, what are the most significant factors you feel bears on the right to control? I mean, just hone in on the points, one through four or five. What do you think tips the scales here in favor of the claimant? The ability to shut off this man's computer. That's the first one. And it goes downhill from there. Because as far as I'm concerned, the ability to shut off this man's computer made it economically infeasible for him to operate as a cab driver in the suburbs. Well, what if the computer was being, I mean, they have no right to control the computer. What if counsel says your guy is a subscriber to dispatch services? And that's where we get into this, my theory, my opinion, that this is nothing but a well-disguised attempt to fair share whether they're leasing, and it's a relationship that is an absolute intertwined relationship in the necessity of operating their business as a cab company in the suburbs. I don't think I've ever remembered in my own personal experience ever calling or standing on a corner hailing down a cab in the suburbs where I live if I wanted to go to O'Hare. I called, and they called, and they set up the cab company coming to my house. And I don't know of anybody else that would have it any different in the suburbs anyways. Counsel, your time is up. You'll have time to reply.  Thank you, Your Honor. Sorry. Good morning, Justices, Counsel. May it please the Court, Dan Ugaste on behalf of 303 Taxi. I'm always a little bit amazed at how individuals hold themselves out to the IRS as operating their own business. They fill out their tax forms that way. They submit expenses, take deductions in that matter. And then they come to the Workers' Compensation Commission and claim that they're employees. And while I realize there are different standards, and these standards for the Workers' Compensation Commission have been set by this Court as well as the Supreme Court, fortunately in this case for 303, those standards are met that the person is an independent contractor in both situations. As the Commission found, and correctly states, the test for whether a person's an employee or an employer relies largely upon control. And the control just wasn't exhibited here, just as it wasn't in West Cab. I won't go over each of the facts. How do you define control? Counsel's last point, I think, is the one we're interested in hearing your response to. Okay. And just the part about shutting off the computer? Correct. Yes. Okay. In effect, we have a different environment in the suburbs than we do downtown. And that is the environment in which he chose to operate his own business. He decided to go to a suburban company and operate a suburban cab. He didn't choose to come downtown. He didn't choose to pay whatever downtown rates may be for extra business or what have you. He chose to operate in the suburbs. And whether it's more reliant upon dispatching or not, we don't know for sure. That's counsel's speculation. There's been no testimony, no evidence, that you can't get a fare in the suburbs. I personally have hailed a cab at a train station in the suburbs. I can't say that it can't be done. It doesn't mean, though, that that person is any more an employee just because he has less opportunity to earn a fare outside of dispatch than someone who is operating in the city. It's whether or not they're actually being controlled. Let's talk about that. Let's talk about the realm of speculation. He's talking about things, as I understand it, the company sets the drivers, sets the standards for flat rates for certain trips that require discounted rates, preferred customers, 10 percent withholding on credit cards. As existed in West Cab, Your Honor. Are those elements of control? There may be some elements that you could look at and say this could be some control. I don't know that taking a fee on a credit card actually shows control. That's just a fee for a service. The person wants to take or use a credit card, the company that has to process it takes a fee so that they can make money as well. I mean, 303 is a business. I'm not going to deny that. What about the flat rates? The company says you've got to charge a certain rate for this trip. It is in order to promote extra business for the people who want to drive under the 303 logo. They want as many fares as they can get. We assume they want as many fares as they can get. That is why they are operating a cab under the 303 logo. In order to help them obtain as many fares as they can get, 303 has gone out and reached deals with large corporations and sent your people. Excuse me. You said they are operating a cab under their logo? Who are they? The owners of the cab and the drivers of the cab operate under the 303 logo. And they're looking to get as many fares. That's how they make their money. The drivers and the owners are in the business of transporting people and collecting fares. That is how they make their money. 303 is in the business of selling a brand and selling subscriptions. And the more people they have that want to buy that brand and buy those subscriptions, the more money they make. They make no money by anyone moving anybody. If all those drivers didn't move a soul, well, that being practical, but if a driver chose not to move anybody over a month's period of time, it wouldn't matter to them. He still had to pay the same subscription fee. He still had to pay the same monthly rental or monthly certificate fee. That's where 303 makes their money. It's even a greater difference than in West Cab. In West Cab, if a driver chose not to drive at all, he wouldn't lease the car or run up any mileage. In this particular case, the owner of the car could sit on the car, and 303 still makes their money. They're interested in providing a service that, or a situation in which the drivers and the owners can make as much money as possible for themselves. And by reaching agreements with large companies like that, it provides them with that opportunity. I think that's where quite a bit of confusion has come in with counsel over the actual business model. 303's business model does involve taxi service. It just doesn't involve moving people and collecting fares. It involves selling the right for someone who wants to be part of a bigger organization and not just operate on their own independently and have to go to the village and get their own, even though they had to have paid their own business license, the greater right to operate a cab within that village on their own and to work as a cab driver owning their own company. That person could lease that car to anybody they wanted, let whoever they wanted use it, could have it running 24 hours a day if they wanted, or they could do it just one hour a week if that's what they so chose to do. Again, there was no control by 303 with that. The differences, as I mentioned, between 303 and West Cab are really very minimal. And in fact, I believe they work to 303's favor in this particular situation since West's equipment was provided by 303. And again, getting back to the computer and being able to shut it off and whether that exerts control, counsel keeps saying they had to lease a computer from 303. I didn't see anywhere in the testimony where someone said in order to operate a cab under the 303 logo, you have to lease a computer from 303. What you had to do is if you wanted to get dispatching service that 303 was providing, you had to then lease a computer because that's how they did it. But no one told them that in order to operate a 303 cab, by the way, you also have to lease this computer. That's not in the record that they had a leased computer? I didn't recall seeing it anywhere. I looked again as I was preparing for this, and I did not see it, sir, Your Honor. The bigger question, though, is was there enough evidence in the record for the commission to decide that this person was not an employee but, in fact, an independent contractor? And I believe when the court looks at the totality of the circumstances, just as the commission did, it weighs in the favor of an independent contractor, and it clearly is not against the manifest way of the evidence. We would ask that you affirm the commission's decision. Thank you. Thank you, counsel. Counsel, you may reply. Thank you, Your Honor. If I may just state the first thing I've noted in the Ware case, they discounted the payment or withholding of taxes as being dispositive of virtually anything when it came to the decision of whether one was an independent contractor. I also note that there's nothing in the evidence that shows that my client had any rights whatsoever when it came to the computer being shut down. It was unilateral. In fact, the evidence shows that if you went out to your car and you turned on the computer, if you could not log in, you were shut out for one reason or another. And when you got back on, when you logged back in, you were allowed to come back in. It was a one-way street is what it was. Did the claimant ever testify he was required to lease the computer to someone else? I believe he did, Your Honor. I believe if he didn't directly testify to that, he strongly implied that, and so did their witness Yatsik. Well, yeah, he obviously needed a computer. How could you dispatch calls if there was no computer, right? You couldn't. Okay. The question is, did he have to get a computer through them? Was he required? Yeah, he had to get the computer through them. In fact, they had two, the testimony is they had two, quote, unquote, preferred installers for their computer where they sent them. Again, preferred comes up quite a bit by their testimony. Whether the counsel could pick up a cab at the train station, that's nice, but let's be realistic. What cab driver without this computer system could cover his costs waiting for a pickup somewhere in the suburbs? I don't know of any. By the way, my client only worked for 303. That was his testimony, solely for 303. And their client, when asked whether he could work for someone else with the 303 flags on it, said, I think not, was his testimony. Contrary, of course, to theirs, this arrangement of the computer lease and the membership, make no mistake about it, it's a well disguised, it's ingenious, I love it, it's a great disguise. But it is fee sharing covered. That's all it is. It's another way of making money. They had to get as many cabs on that street, in that village, wherever, to get more money. If they weren't sharing the fees, they're not in this for charity, I can tell you that. And they never advertised themselves as a computer leasing company. They always advertised themselves in their own brochure as a 303 taxi company. There was only one way 303 would be successful, and that is getting people moved from here to there, and they needed my driver and other drivers to do it. If they advertised as a taxi provision service? No, it just says 303. No, no, I said if they did, would you have a different view on that? No, I would not. Thank you, Your Honor. Thank you. Thank you, Counsel Paulson. This matter will be taken under advisement and a written disposition shall issue.